IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 3, 2018

IN RE ELLA P.[1]

**Appeal from the Chancery Court for Madison County**
**No. 74391    James F. Butler, Chancellor**

_____

**No. W2017-02219-COA-R3-PT**

_____

This action involves a termination petition filed by the mother and stepfather against the father of a minor child. Following a bench trial, the court found that the statutory grounds alleged, abandonment for failure to visit and to support, were not supported by clear and convincing evidence. The petitioners appeal the denial of the petition and the assessment of costs accrued below. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S. and BRANDON O. GIBSON, J., joined.

G. Michael Casey, Jackson, Tennessee, for the appellants, Bradley R. and Rachel R.

Nicholas B. Latimer, Jackson, Tennessee, for the appellee, Tristan W.

**OPINION**

**I.    BACKGROUND**

Ella P. ("the Child") was born to Rachel R. ("Mother") and Tristan W. ("Father") in May 2013. The parents never married. Mother maintained physical and legal custody of the Child and lived with her parents in Milan, Tennessee, while Father lived with his parents in Trezevant, Tennessee. Mother took the Child to visit Father on a weekly basis until February 2014, at which time Mother sought an order of protection from the General Sessions Court in Gibson County. The court ultimately entered an order based

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

upon her allegations of stalking. Pursuant to the order, Father was required to stay away from Mother's home and workplace. The order expired on September 24, 2015.

Mother obtained a new telephone number and moved to Indiana with the Child in February 2014. She returned to Milan two months later before moving to Jackson, Tennessee in May 2014. Mother did not advise Father of her moves or her new telephone number. Mother married Bradley R. ("Stepfather") in May 2015. The Child has resided with Mother and Stepfather since that time.

Meanwhile, Father was incarcerated on May 4, 2016. Mother and Stepfather (collectively "the Petitioners") filed a petition to terminate Father's parental rights on May 13, 2016, based upon the statutory grounds of abandonment for failure to visit and to support. Father filed a motion to dismiss, alleging that the petition should be dismissed for failure to allege grounds with sufficient detail and specificity. He alternatively argued that any alleged abandonment was not willful because he was unaware of the Child's whereabouts until the filing of the termination petition.[2] He claimed that he made several attempts to locate the Child but that his efforts were thwarted by Mother.

The court denied Father's motion to dismiss, and the case proceeded to a hearing on October 16, 2017. Father participated via telephone because he was incarcerated in Weakley County at the time of the hearing. Mother testified that she first met Father in high school when she was 16 years old. They dated on and off until she became pregnant in September 2012. She claimed that Father "emotionally and physically abused" her and that he also abused drugs throughout their relationship. She admitted to marijuana use prior to pregnancy but claimed that she stopped smoking marijuana when she learned of the pregnancy. She stated that Father attended no more than one doctor's appointment, if any, and that he did not provide financial support throughout the pregnancy.

Mother testified that Father was not present at the hospital for the birth of the Child per her request and that she did not list him as the father on the birth certificate. She agreed that he visited the day after the birth and that she then took the Child to visit him on a twice weekly basis. Her parents did not approve of her relationship with Father and were unaware of her visits. Father provided clothes on one occasion and gave her $20 on another occasion. She ended her relationship with him in September 2013, when he failed a drug test provided by her.

Mother testified that Father last saw the Child in February 2014. She claimed that at that time, Father was "doing things that [she] did not consider safe for [the Child]" and

_____

[2] Father later alleged that the Petitioners failed to establish his paternity of the Child. The parents were ordered to undergo genetic testing, the results of which were not apparent from the record.

that he would "get very mad" when she confronted him. She explained that she did not believe that she and Ella were safe around him. She eventually filed a request for an order of protection in March 2014 based upon Father's extreme behavior and threats of violence toward her. She noted that he advised her that he had hired someone to kill her and that "all he had to do was pay." She stated that her request for an order of protection was granted on September 25, 2014, and that it ultimately expired on September 24, 2015. Father was present at the initial hearing, where the court advised him to "go next door" to the juvenile court and request visitation. The order of protection provided that child support and visitation were "per juv[enile] court."

Mother testified that Father had not visited the Child or remitted any form of child support since February 2014. She acknowledged that she moved to Indiana in March 2014 and did not return until May 2014. She returned to her prior residence in Milan but did not hear from Father, who had also not filed a request for visitation with the court. She then moved to Jackson at the end of May 2014 with her mother and the Child. She remained active in the Milan community and returned to her prior employment. She explained that she and Father's mutual friends knew of her employment in Milan. She later obtained employment in Jackson in May 2015 but claimed that a simple Google search revealed her employment position and her address.

Mother believed that it would have been "very easy" for Father to "make contact." She also appeared in court for a hearing on Father's charge of domestic assault after she had moved to Jackson. He did not appear at the hearing. She agreed that she did not share about her life on social media for fear that Father would harm Stepfather. She explained that Father once told a mutual friend that he would kill her significant other if she ever married.

Mother admitted that Father's fiancé contacted her mother through Facebook. She explained that her mother did not know how to retrieve the message and did not inform her of the message until after she filed the petition.

Mother testified that she met Stepfather in Fall 2014 and that they married in May 2015. She stated that she and the Child have resided with him since their marriage. She explained that he not only provides for them financially but has also served as the Child's father. She described a loving relationship between Stepfather and the Child.

Stepfather also described a loving relationship between himself and the Child and expressed his desire to adopt her. He claimed that Father had not provided support, medical care, or gifts and that Father had also not visited the Child since he and Mother started dating. He acknowledged that a Google search would reveal Mother's employment, her Facebook account, and her address. He agreed that he had not met

Father and stated that he would have "no idea" if Father would have knowledge of his marriage or Mother's name change as a result of their marriage.

Father testified that he was currently incarcerated in the Weakley County Detention Center for a charge of driving on a revoked license and a seatbelt violation that occurred in 2015. He acknowledged that he had also been charged with aggravated burglary in September 2015 and received a three-year sentence. He explained that he was 19 years old when he incurred the charge and that he was not involved with the Child or Mother at that time.

Father acknowledged that his relationship with Mother was "fairly good" at first but stated that they had disagreements and that he picked the "wrong life at first." He agreed that he was not present for the Child's birth per Mother's request but stated that he visited the next morning. He claimed that he provided money for diapers and visited the Child almost every weekend after the birth. He agreed that he continued to smoke marijuana after the Child was born.

Father denied ever physically abusing Mother or threatening to kill her or her future spouse. He never heard from Mother after the court entered the order of protection, and he did not contact her for fear of violating the order. He noted that Mother had blocked him from her Facebook account. He claimed that he sent messages to her mother and attempted to connect with her brothers. He provided that he was incarcerated beginning on March 4, 2016, and that he had no knowledge of Mother or the Child's whereabouts from at least November 4, 2015, until the filing of the petition. He agreed that he never initiated legal proceedings to secure visitation or pay child support. He explained that he was not financially stable prior to his incarceration. He expressed a desire to reconnect with the Child and claimed that he would support her. He claimed that his efforts to contact the Child since the filing of the petition have been unfruitful.

Following the hearing, the court denied the termination petition, by order entered on November 3, 2017, finding that the grounds for termination had not been established by clear and convincing evidence. The court stated,

> Father's bad acts which have landed him in jail are not dispositive of the issue of whether or not grounds for termination exist during the relevant time period. The Court must be convinced by the presentation of clear and convincing evidence. The Court is not convinced that grounds for termination exist as to the alleged grounds of non-support and non-visitation particularly when viewed in light of the facts concerning Mother's moving her residence, changing her phone number, and her family refusing to respond to Father's inquiries. Further, Mother while

indicating that [Father] was the [biological father], made no effort to notify [him] or any member of his family where she or the [C]hild were at any particular time after February, 2014. Based on the foregoing, the Court finds that while Mother is able to prove the technical grounds of non-support and non-visitation, that Father's defense dilutes Mother's ability to prove those grounds by clear and convincing evidence and that they were willfully committed.

The court also found that termination was in the best interest of the Child. The court assessed costs against the Petitioners, who filed this timely appeal.

## II.     ISSUES

We consolidate and restate the issues on appeal as follows:

A.     Whether the court erred in finding that the Petitioners failed to establish by clear and convincing evidence abandonment for failure to remit child support pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(iv).

B.     Whether the court erred in finding that the petitioners failed to establish by clear and convincing evidence abandonment for failure to visit pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(iv).

C.     Whether the court erred in assessing court costs against the Petitioners.

## III.     STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record

and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (internal citations omitted).

## IV. DISCUSSION

### A. & B.

For the purposes of termination proceedings involving a parent who was incarcerated when the petition was filed, abandonment means that:

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

As a threshold issue, the Petitioners allege that the court failed to address whether the statutory ground of abandonment was supported based upon Father's conduct prior to incarceration that exhibited a wanton disregard for the welfare of the Child. Father asserts that this ground was not pled in the petition, raised at the hearing, or addressed by the trial court. The petition provides as follows:

Termination of [Father's] parental rights is sought based upon, as alternatives to one another, the following grounds, which [the Petitioners] are prepared to prove by clear and convincing evidence:

    a.     Abandonment;
    b.     Failure to Visit; and
    c.     Failure to Support.

While the Petitioners alleged that Father was incarcerated, they did not cite Section 36-1-102(1)(A)(iv) or specifically allege that abandonment was warranted based upon Father's conduct prior to his incarceration. This ground was also not discussed at the hearing or addressed by the court in the order denying the petition. The court stated,

Father's bad acts which have landed him in jail are not dispositive of the issue of whether or not grounds for termination exist during the relevant time period.

Accordingly, this statutory ground was not properly pled or tried and is waived on appeal.

We next consider Father's alleged willful failure to support or to visit. A parent's willful failure to support "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is "support, under the circumstances of the individual case, [that] is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). A parent's willful failure to visit "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

This court has consistently held that the term willfulness as it applies to a party's failure to remit support or to visit must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *In re Audrey S.*, 182 S.W.3d at 863. "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64.

The Supreme Court has held that "a parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *In re A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (citing *Swanson*, 2 S.W.3d at 189). However, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (citation omitted) (upholding termination when the father did not take court action to secure visitation like the parents in *In re A.M.H.*). "The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially." *In re Audrey S.*, 182 S.W.3d at 864 (citations omitted).

In determining whether termination of Father's parental rights was warranted based upon the statutory grounds of abandonment for failure to visit and to remit support, the court considered the four months preceding March 4, 2016, the date of Father's incarceration. The relevant time period was November 4, 2015, through March 3, 2016.[3] Here, the record reflects that Father was unaware of Mother's whereabouts during the relevant time period as evidenced by her moving her residence and changing her phone number and her family's failure to respond to Father's inquiries. While Father failed to initiate court proceedings to secure visitation like the parents in *In re A.M.H.*, we believe this failure is excused by his inability to locate Mother, who had moved to another city, *during the relevant time period* after the expiration of the order of protection.

Further, the Petitioners failed to establish Father's ability to remit support during the relevant time period. No evidence was presented concerning his ability to remit support, with the exception of Father's testimony that he was not financially stable prior to his incarceration. With these considerations in mind, we conclude that there was not clear and convincing evidence to establish that Father willfully failed to visit and to support during the relevant time period. Accordingly, we affirm the denial of the termination petition. This court "may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result." *City of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d 49, 60 n. 18 (Tenn. Ct. App. 2004); *see also Bige v. City of Etowah*, No. M2013-01771-COA-R3-CV, 2014 WL 6888857, at *8 (Tenn. Ct. App. Dec. 4, 2014) (quoting *City of Brentwood* for the same proposition).

---

[3] "The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014). We reason the same holds true for the start date of the parent's incarceration.

C.

Having affirmed the court's denial of the petition, we also affirm the assessment of costs against the Petitioners.

## V.    CONCLUSION

The trial court's order denying the termination petition is affirmed, and the case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellants, Bradley R. and Rachel R.


_____
JOHN W. McCLARTY, JUDGE